UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LARRY SOLHEIM and RITA SOLHEIM,

Plaintiffs,

-- against –

BIGTOPWORKS LLC, COMPASS PARTNERS
LLC, RICHARD PERLMAN, BARRY SALZMAN,
JAMES PRICE, NEIL KAHANOVITZ and
MICHAEL COUPER,

Defendants.

**COMPLAINT**

Civil No.  18-CV-9383

**JURY TRIAL DEMANDED**

Plaintiffs LARRY SOLHEIM and RITA SOLHEIM (together, "Plaintiffs"), by their

attorneys, THE KAPLAN LAW OFFICE, for their Complaint against Defendants

BIGTOPWORKS LLC, COMPASS PARTNERS LLC, RICHARD PERLMAN, BARRY

SALZMAN, JAMES PRICE, NEIL KAHANOVITZ and MICHAEL COUPER (collectively,

"Defendants"), allege as follows:

## NATURE OF THE CASE

1.    The Big Apple Circus, one of New York's beloved cultural institutions, fell on financial

hard times beginning in or about 2009.  The hard times continued over the ensuing several

years.  The financial situation became critical as the years passed.  After having consulted

with him from time to time over these difficult years, in 2015 the Circus hired Larry

Solheim, a seasoned circus manager with an excellent reputation in the industry, to help

turn the Circus around.  While Mr. Solheim's efforts had a positive effect on the Circus'

prospects, it ultimately was not enough to save it.  After more than thirty years of annual

shows, the Circus' 2016-2017 season was cancelled, most employees were laid off—
including the Solheims—and, in late 2016, the Circus filed for Bankruptcy.

2.    Mr. Solheim applied his expert understanding of the industry in general, and of the Big
Apple Circus in particular, to formulate a new business plan.  The Solheims soon began
seeking investors to join them in a bid to purchase the Circus' assets in hopes of reviving
the Circus.    After discussions with several potential investors, the Solheims chose
defendants, investors specializing in corporate restructuring, to join their efforts.  Although
they were seasoned investors and businessmen, Defendants had no experience in the circus
industry or in the entertainment industry generally.  The Solheims' new business plan
formed the basis of the group's bid for the Big Apple Circus' assets.

3.    The group won the bid against other seasoned and viable competitive bids, in part because
the Circus was a non-profit organization with a mission of giving back to the community
in various ways and the Circus' Board of Directors believed Mr. Solheim would be the best
steward for continuing that mission.  Mr. Solheim's reputation and expertise were key to
winning the bid.

4.    At the same time, several competing circuses courted Mr. Solheim's services once it
became public knowledge that the Big Apple Circus was headed for bankruptcy and had
terminated Mr. Solheim (along with nearly its entire work force), exemplifying his
excellent reputation in the industry.  However, Mr. Solheim rejected those offers in order
to focus on the bid for the Big Apple Circus, which is where he saw his future.

5.    At the outset of their relationship and while he was formulating the bid for the Circus, Mr.
Solheim informed Defendants that he expected partnership status and an ownership stake
in the Circus—he was not formulating his business plan and pursuing the acquisition bid

to be a mere employee. Defendants agreed, promising Mr. Solheim partnership and an ownership stake and advising that he would be in charge of the Circus' rebirth. Defendants also eventually offered Ms. Solheim a small ownership stake along with a management position. However, just a short time after winning the bid, taking control of the Circus and beginning operations, Defendants restricted Mr. Solheim's role and ultimately hired a third party as CEO—Defendant Couper. Defendants quickly jettisoned Mr. Solheim's budget that he had spent months preparing and generally ignored his expert advice. Shortly thereafter, both Mr. Solheim and Ms. Solheim were abruptly fired without explanation.

6.     Defendants made false promises in order to leverage Mr. Solheim's reputation and expertise long enough to win the bid for the Circus only to kick him and Ms. Solheim to the side once they got what they wanted. Defendants reneged on those promises. Defendants fired Plaintiffs after promising them long term employment, granting them an ownership stake, and partnership status for Mr. Solheim—promises upon which Plaintiffs justifiably relied to their detriment inasmuch as they relocated their family across the country and turned down other lucrative employment opportunities. Defendants have refused to even acknowledge Mr. Solheim's partnership status or Plaintiffs' ownership stake in the Circus, even though they repeatedly represented Mr. Solheim as a partner publicly and privately and continued to do so even after terminating his employment.

7.     Defendants took further action to harm Plaintiffs after termination by withdrawing a separation package offer, by twice giving false information concerning Plaintiffs to the State unemployment authorities to interfere with their benefits, and by defaming Plaintiffs with vendors and others within the industry. Defendants reprehensible conduct has caused

great harm to Plaintiffs and cannot be allowed to stand without compensating Plaintiffs for their various losses and making them whole.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1332 because there is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367 and because they are so related to the claims in this action within the Court's jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendants conduct business in this District and because a substantial part of the acts/omissions giving rise to the claims herein occurred in this District.

## THE PARTIES

10.     Plaintiff Larry Solheim ("Mr. Solheim") is a resident of the State of Missouri.

11.     Plaintiff Rita Solheim ("Ms. Solheim") is a resident of the State of Missouri.

12.     Defendant BigTopWorks, LLC ("BigTop") is a Delaware limited liability company doing business in the State of New York which owns and operates a circus known to the public as the Big Apple Circus.

13.     Defendant Compass Partners LLC ("Compass") is a Florida-based merchant banking and advisory firm specializing in middle-market companies and corporate restructuring. Compass does business in the State of New York.  Compass is a part owner and member of BigTop.

14.     Upon information and belief, Defendant Richard Perlman ("Perlman") is a resident of the State of Florida. Defendant Perlman is a partner in Compass, which is, in turn, a part owner and member of BigTop.

15.     Upon information and belief, Defendant Barry Salzman ("Salzman") is a resident of the State of New York. Defendant Salzman is a partner in Compass, which is, in turn, a part owner and member of BigTop.

16.     Upon information and belief, Defendant James Price ("Price") is a resident of the State of Georgia. Defendant Price is a partner in Compass, which is, in turn, a part owner and member of BigTop. (Defendants Compass, Perlman, Salzman and Price are referred to herein as the "Compass Defendants")

17.     Upon information and belief, Defendant Neil Kahanovitz ("Kahanovitz") is a resident of the state of New York. Defendant Kahanovitz is a part owner and member of BigTop. The Compass Defendants and Kahanovitz are referred to herein, together, as "Defendants").

18.     Upon information and belief, Defendant Michael Couper ("Couper") is a resident of the state of New York. Defendant Couper was BigTop's CEO at times relevant to this lawsuit.

## **FACTUAL ALLEGATIONS**

*Background*

19.     The Big Apple Circus was created in New York City in or about 1977 and presented a one-ring circus. Eventually the Big Apple Circus became a non-profit organization.

20.     In 1981, the Big Apple Circus began performing at Damrosch Park, Lincoln Center, in Manhattan. The Big Apple Circus' run became an annual event at Damrosch Park

beginning in the Fall of each year and running into the Winter of the following year from 1981 through 2015.

21.    Throughout its existence, in addition to producing a circus, the Big Apple Circus has been known for various community outreach programs, including special performances for children with disabilities.

22.    For example, in or about 1986, the Big Apple Circus began its Clown Care unit, perhaps the most successful of its outreach programs.  The Clown Care unit visited and performed for hospitalized children in order to attend to their psycho-social needs and to help them adjust to the stress and anxiety posed by being hospitalized.

23.    Plaintiff Larry Solheim has been in the circus industry for nearly thirty years and, until August of 2015, was the General Manager of TZ Productions— a well-known circus often sponsored by and performing under the banner of various charitable causes, including the Rotary Club, Boys and Girls Clubs of America, the Ronald McDonald House, Shriners International and others.

24.    During those years, Mr. Solheim also worked from time to time as a contractor and/or consultant for many other circuses based in North America, including Ringling Brothers, Carden Circus International, Hamid Circus Inc., Royal Hannaford Circus and others. Further, Mr. Solheim was involved with trade organizations in the circus industry, including the OABA (Outdoor Amusement Business Association) and SCAFRA (the Shrine Circus and Fund Raising Association) and was an invited speaker at several of these associations' gatherings.  Mr. Solheim has also worked on animal rights issues and has testified as an expert witness in that regard (on behalf of the U.S.D.A. and others).

25. Because of his success running TZ Productions and his other work for various circuses and industry trade associations, Mr. Solheim was well-known and highly regarded in the circus industry.

26. After several years of financial difficulties, by 2015 the Big Apple Circus had fallen into millions of dollars of crippling debt. Among its efforts to try to salvage the business, the Big Apple Circus enlisted Mr. Solheim to be its Vice President and General Manager. Ms. Solheim was also hired to work with the circus.

27. As the General Manager of the Big Apple Circus, Mr. Solheim created and affected a business plan to lower costs, increase revenue and address the circus' debt problems.

28. The Solheim plan proved successful in cutting costs and increasing revenue and in moving toward profitability. However, the Big Apple Circus required additional funding to continue operating.

29. In or about April of 2016, following Mr. Solheim's advice, the Big Apple Circus began a fund-raising campaign to raise $2 million to keep the circus in business. With the funding and Mr. Solheim's operational plan in place, the Big Apple Circus hoped to earn enough from its 2016 run at Lincoln Center to survive and return to profitability.

30. However, the fund-raising efforts fell short of the $2 million goal. Ultimately, the Big Apple Circus was unable to overcome its financial difficulties. By June of 2016, as the circus' touring season came to a close, Big Apple Circus management realized that the circus could not survive financially.

31. The Big Apple Circus closed its touring company and laid off almost its entire staff, including Plaintiffs.

32. Shortly thereafter, in July of 2016, the Big Apple Circus publicly announced that its 2016 Damrosch Park show would not run.

33. In or about November of 2016, the Big Apple Circus filed for Chapter 11 bankruptcy protection.

*Pre-Acquisition*

34. After being laid off and with the Board's approval, Mr. Solheim and Ms. Solheim continued working, without pay, to look for ways to revitalize the Big Apple Circus. In an effort to save the circus, Mr. Solheim reached out to various investors to persuade them to join him in a partnership that would then become a partner of Big Apple Circus.

35. While Mr. Solheim led the effort, Bello Nock—the famous Bello the Clown ("Bello")— expressed interest in joining Mr. Solheim's efforts. Bello introduced Mr. Solheim to Defendant Kahanovitz with whom Mr. Solheim and Bello combined efforts to identify suitable investors.

36. For several years, Bello had been the public face of the Circus. He and Defendant Kahanovitz had also been close friends and business associates for some forty years.

37. By late July of 2016, Mr. Solheim determined that the preferable course would be to seek investors to join him, Bello and Defendant Kahanovitz in an effort to acquire the assets of Big Apple Circus.

38. By August of 2016, Mr. Solheim first proposed purchasing the Circus' assets to the Circus.

39. Mr. Solheim pitched his asset acquisition proposal to Defendant Kahanovitz who, in turn, brought it to various investors.

40.     Defendant Kahanovitz connected the group with Defendant Perlman and the Compass
        Defendants in late August, 2016 with the aim of securing them as investors.

41.     During his proposal and at all times thereafter, Mr. Solheim insisted on being a partner
        with an ownership interest in the project. Mr. Solheim was clear with Defendants that he
        had no interest in laying the groundwork for and shepherding the acquisition venture "just
        for a job." He would only undertake the project as a partner with an ownership interest.
        He also stressed to Defendants that Ms. Solheim would bring valuable expertise and
        experience to the table and should play an integral role in the Circus' operations.

42.     Defendants expressly and verbally assured Mr. Solheim that he would have an ownership
        interest and be a partner in the venture and suggested that they would, as they had with
        many others, make him a millionaire. Defendants thereafter partnered with Mr. Solheim
        in his effort to acquire the circus' assets.

43.     Trusting Bello's original recommendation concerning Defendants and reassurances of the
        group's intentions to be partners, the Solheims dedicated themselves to the group and
        advised the group that it was time to commit to the project and for Perlman to communicate
        directly with the Chairman of the Big Apple Circus' Board of Directors to add validity and
        support to the Solheim group's plan. Prior to that, Mr. Solheim had handled all contact
        with the Board on behalf of the group.

44.     Soon thereafter, despite their decades-long friendship, Bello and Kahanovitz had a falling
        out and Bello left the group. Bello formed his own group of investors and began a
        competing effort to acquire the circus' assets.

45.     Prior to leaving the group, Bello warned Mr. Solheim that the inexperienced Kahanovitz
        would want too big a role in day-to-day management of the circus. However, Kahanovitz

repeatedly assured Mr. Solheim that he wanted only a limited role—limited to marketing and production quality assurance.

46.   Shortly thereafter, Defendant Perlman first met with the Big Apple Circus Board to begin talks in connection with acquiring the circus.

47.   However, concerned about legacy debt, all involved agreed that it would be preferable to enter an agreement only after the Big Apple Circus entered into bankruptcy protection.

48.   When the Big Apple Circus filed for bankruptcy, the group formed by Mr. Solheim—the Compass Defendants, Kahanovitz and Mr. Solheim (the "Solheim Group")—competed against other parties (including Bello's group, Cirque du Soleil, V-Star, Herschend Entertainment and others) in bidding for its assets, including its intellectual property.

49.   Because part of the Big Apple Circus's mission included a well-established community service component, the Big Apple Circus Board's approval—critical for a successful bid— was more than a simple matter of approving the highest bidder.  The Board was also concerned that any party acquiring the Big Apple Circus would commit to maintaining its high level of performance and its mission to serve the community.  The Board was prepared to recommend acquisition by someone other than the highest bidder based on these concerns.[1]

50.   Indeed, the terms of the Court-ordered auction included language strongly encouraging that the winning bidder maintain the Big Apple Circus' mission, including special performances for children with disabilities.

---

[1] Although the Board overwhelmingly voted in favor of the Solheim Plan, the vote was not unanimous. Bello's group received some votes, even as Bello's group offered a lower bid monetarily.

51.   In part because the community-service issues and artistic quality of the Circus involved were so important (along with the fact that the Circus was a not-for-profit organization with sizeable debt), the Attorney General became involved.  His approval was also required for any acquisition to be approved.

52.   Neither Compass nor the Compass Defendants (Perlman, Price and Salzman) had any experience in the circus industry.

53.   While Defendant Kahanovitz, in his youth, had briefly been a concessionaire, a clown and an acrobat, he had no experience in circus management.

54.   In order to make a bid persuasive to the Court and to the Big Apple Circus Board, Mr. Solheim's expertise and circus industry connections along with his excellent reputation as a circus manager were critical.

55.   In or about August of 2016, Defendant Richard Perlman said that he would participate in the deal, "but only if Larry [Mr. Solheim] is involved."  Defendants Salzman, Price and Kahanovitz expressed the same sentiment thereafter and on many occasions as the deal progressed.  Mr. Solheim was the focal point of Defendants' efforts to acquire and subsequently to run the Big Apple Circus.

56.   Indeed, Mr. Solheim formulated the plan that the Solheim Group ultimately presented to the Big Apple Circus Board (the "Solheim Plan").  After carefully reviewing and vetting the proposed plan prior to submitting it for approval, the Solheim Plan was repurposed under Compass Partners' name, with Mr. Solheim as part of the plan, and submitted to the Bankruptcy Court for its approval.

57.   Without Mr. Solheim's expertise, the Board was leery of Compass, a venture capital firm with no experience in the circus industry or even generally in the entertainment industry.

58.    Throughout the process, Mr. Solheim was in direct contact with the Big Apple Circus
       Board and he was able to allay their concerns and to successfully persuade them to support
       his Group's bid.

59.    The Big Apple Circus Board ultimately approved the Solheim Group's bid to be its
       successor over other viable bids in large part because Mr. Solheim was part of the group
       and would bring his expertise to bear on the operations of the BigTop circus.

60.    More than one member of the Executive Committee of the Board deemed Mr. Solheim the
       best steward for the Big Apple Circus name.

61.    Ownership interests in the group, which later became BigTop, are held by Compass,
       Kahanovitz, Mr. Solheim and (eventually) Ms. Solheim.[2]

_Plaintiffs' Pre-Acquisition Sacrifice and Work_

62.    Mr. Solheim and Ms. Solheim each worked more than full time for some eight months,
       from July of 2016 through February of 2017, primarily from their home in Joplin, Missouri,
       to formulate the bid and, anticipating success, to prepare for operating the circus in the
       event the Solheim Group won the bid.

63.    Mr. Solheim and Ms. Solheim each worked diligently on behalf of the Circus during this
       period.

64.    Mr. Solheim and Ms. Solheim each undertook their pre-acquisition work without pay.
       They did so because Defendants assured Mr. Solheim that he would be a member/partner
       in BigTop, that he would have an ownership stake, that he would be a key player in

---

[2] The Solheims did not ask for an ownership interest for Rita Solheim.  Defendants offered it.

managing the circus, that he would be "well taken care of" and that he would be with the circus for the long haul.

65.    In fact, as noted above, in or about August of 2016, Defendants Perlman and Kahanovitz first told Mr. Solheim that he would be in charge and would be running the circus. Defendants repeated that promise to Mr. Solheim numerous times throughout the preparation process.

66.    Based on his having been the last Vice President and General Manager of the Big Apple Circus, Mr. Solheim further understood the real value of its assets (beyond the information available in the bankruptcy records), which was instrumental in setting the amount bid for the assets.

67.    During the bidding process and in preparing to manage and operate the circus, Mr. Solheim applied his deep knowledge of, and cultivated his business connections within, the circus industry.

68.    Mr. Solheim ultimately prepared the bid for acquiring the Big Apple Circus and created a budget in connection with preparing BigTop's business plan.

69.    Lincoln Center, the Big Apple Circus' primary venue for decades, also had concerns about maintaining the circus' reputation and its community-oriented sensibility. Once again, Mr. Solheim's industry reputation, his previous executive position with the Big Apple Circus and his understanding of Lincoln Center's concerns were critical to the BigTop's relationship with Lincoln Center. Indeed, Mr. Solheim successfully negotiated a long-term (ten year) lease with Lincoln Center (contingent on the asset acquisition) for a lower rate than the Big Apple Circus had negotiated many years earlier, providing a significant savings to BigTop.

70.    Mr. and Ms. Solheim also took steps toward securing commitments from critical vendors to work with BigTop along with key circus employees.  Mr. Solheim's success in this regard was premised upon his many years in the industry and on his direct experience as Vice President and General Manager of the Big Apple Circus prior to the bankruptcy. Vendors were leery of doing business with BigTop because some had lost money when the Big Apple Circus filed for bankruptcy protection and Compass Partners had no experience in the industry.  They nevertheless agreed to do business with BigTop in large part based on their trust in and respect for Mr. Solheim.

71.    For example, Felipe Teran, the Vice President of Operations, and Richard Curtis, the General Manager of BigTop, each ultimately accepted employment with BigTop because of their connection with and trust in the Solheims.  The same is true of Chris Palm, the Concessions Manager; Jimmy Tinsman, the Artistic Director; Allison Dier, the Box Office Manager; Jon Batz-Owings, the Lighting and Technical Director; Thomas Owings-Batz, the Audio Engineer; Elizabeth Turner, the Audio Technician; Jennifer Vidbel, the Animal Trainer; Matthew Zimmerman, the Ring Crew Chief; Sarah Zacharevitz, the House Manager; Alfredo Gracias, the Maintenance Supervisor; Raul Lancheros, the Electrical Superintendent; Michael LeClair, the Tent Boss; Juan Ramos, the Lot Superintendent; and Lisa Lewis, the Director of Community Programs.  A number of these experienced professionals had worked for the Big Apple Circus in the past and, in addition to their years of experience in the industry, they brought valuable continuity to their positions.

72.    Mr. Solheim took further steps to secure key performing artists—including high-wire legend Nik Wallenda—and was involved in artist planning and in marketing for BigTop.

73. During this period, while Mr. Solheim communicated directly with each Defendant from time to time, Defendant Kahanovitz generally served as a communications conduit between Mr. Solheim and the Compass Defendants because the Compass Defendants were less involved in the day-to-day efforts to formulate the group's proposal and prepare for acquiring the circus.

74. However, Defendant Kahanovitz was also protective of his connection with the Compass Defendants and at times interfered with Mr. Solheim's efforts to communicate directly with them. Moreover, Defendant Kahanovitz passed on some of Mr. Solheim's ideas to the Compass Defendants as his own. And on at least two occasions, Kahanovitz also listened in to phone calls between Mr. Solheim and others without revealing his presence until the end of the call.

75. During this period, Defendants reiterated and repeatedly reassured Mr. Solheim that he would be a member/partner in the venture; that he would be given an ownership stake in BigTop; that he would be in charge of the circus; that he should plan on a long and fruitful relationship with BigTop; and that he would be "well taken care of" financially.

76. Defendants further represented Mr. Solheim as a member/partner—indeed as its main representative—in its submission to the Big Apple Circus Board and to the Bankruptcy Court when seeking approval of the acquisition.

77. Ms. Solheim was also assured she'd have a job with the circus and that she could expect a long and fruitful relationship with BigTop.

78. Mr. Solheim's and Ms. Solheim's many hundreds of hours of work over some eight months in connection with and in preparation for the bid was their sweat-equity contribution to the business.

15

79.    Because Mr. Solheim was a partner in the venture, Plaintiffs reasonably relied on
       Defendants' repeated promises and had a reasonable expectation that they would
       eventually be well-rewarded for their sacrifices and their efforts during this time.

80.    Compass and Kahanovitz each made meaningful capital contributions.

81.    During that preparation period, once circus industry players learned that the Big Apple
       Circus was facing bankruptcy, Mr. Solheim was offered other employment in the circus
       industry.

82.    Cirque du Soleil inquired and ultimately offered Mr. Solheim a position as its Director of
       Operations between late 2016 and February of 2017. In fact, Cirque du Soleil waited until
       the Big apple Circus asset acquisition was approved and finalized by the Bankruptcy Court
       before moving on to other candidates for the job.

83.    During the Fall of 2016, several other circuses had discussions with Mr. Solheim about
       joining them, including Carden Circus International, the Royal Hannaford Circus and Feld
       Entertainment (Ringling Brothers Barnum & Bailey Circus).

84.    Mr. Solheim saw his future with BigTop, where he would not only be running the circus,
       but would be an owner and partner in the venture. In justifiable reliance on Defendants'
       repeated promises to that effect, Mr. Solheim rejected these other job offers/inquiries.

85.    Upon learning that Mr. Solheim was receiving job offers in the circus industry, and intent
       on keeping him on board to shepherd the acquisition of the Big Apple Circus assets, in or
       about November of 2016, Defendants offered to pay Mr. and Ms. Solheim $10,000 per
       month for November of 2016 through January of 2017.

86.    Although these payments were delayed—the Solheims received them in two payments,
       one in late December and the other in mid-January—Defendants eventually made them.

87. Concerned that these payments were so late that the Solheims might take jobs with another circus, defendant Kahanovitz insisted on loaning money to them—an offer the Solheims accepted.

88. In early February of 2017, Compass Partners (a/k/a the Solheim Group) submitted its bid to the Bankruptcy Court.

89. On or about February 14, 2017, with the approval of the Big Apple Circus Board, the Bankruptcy Court approved the group's acquisition of the Big Apple Circus assets.

*BigTop Officially Commences Operations*

90. In the wake of winning the bid for the Big Apple Circus' assets, the individuals and entities involved in the bidding process for the Big Apple assets—Compass Partners (Richard Perlman, Barry Salzman and Jim Price), Neil Kahanovitz and Larry Solheim—became partners in BigTop.

91. Mr. Solheim was immediately given authority by the group to finalize the acquisition details with the law firm representing the group during the acquisition process.

92. Shortly after the acquisition, BigTop commenced operations in preparation for resuming the circus' annual Lincoln Center run (after one year with no circus during the bankruptcy and acquisition process) and its touring company.

93. BigTop, through its press releases after finalizing the acquisition of the circus, repeatedly represented to the circus industry press, to the business press and to the world at large that Mr. Solheim was one of BigTop's three members/partners—Compass (comprised of Defendants Perlman, Price and Salzman), Kahanovitz and Mr. Solheim.

17

94.   BigTop continued to hold out Mr. Solheim as a partner even after he was unceremoniously and abruptly ousted.

95.   In addition, after BigTop acquired the circus and began operations, Mr. Solheim became the face of BigTop and proceeded to address the transition from the Big Apple Circus to BigTop.

96.   Having toiled more than full time for approximately eight months with little or no pay, on March 1, 2017, Mr. Solheim and Ms. Solheim began working for BigTop as employees.

97.   Although they commuted to New York approximately twice a month, Mr. Solheim and Ms. Solheim continued to work primarily from their home in Missouri during this time because the circus' base location in Walden, New York was about to be closed and relocated and the landlord would not allow any additional tenants on the property. BigTop had not yet secured a new base location and there was not yet any office space available for their use in New York City.

98.   On one of the Solheims' New York visits in March of 2017, Defendant Kahanovitz insisted on hosting a dinner party so that he could meet many of the Solheims' important contacts, many of whom were hired on in critical positions.

99.   The Big Apple Circus had no run of its annual show at Lincoln Center in 2016. Consequently, all employees had been laid off and no artists were under contract, though the Solheims had taken steps to secure commitments from certain key performers and key employees prior to the Bankruptcy Court's approval.

100.  Mr. Solheim negotiated and signed artist contracts on behalf of BigTop valued at nearly two million dollars.

101. Moreover, Mr. Solheim worked to secure a new off-season site where equipment was maintained and employees resided and arrangements had to be made for relocation.

102. Mr. Solheim further negotiated and signed agreements on behalf of BigTop concerning property leases; the leasing of trucks, equipment and other vehicles; utilities; legal counsel; and multiple vendor contracts.

103. In or about May of 2017, in justifiable reliance on the promises of membership and an ownership stake in BigTop, promises of continuing employment for the long term, and the promise to Mr. Solheim that he would run the circus, Plaintiffs relocated their family and their home to BigTop's new base location in Rock Tavern, New York, arriving as soon as access to the property became available.

104. Also, in justifiable reliance upon Defendants' promises of membership and an ownership stake in BigTop, promises of continuing employment for the long term, and the promise to Mr. Solheim that he would run the circus, Plaintiffs lost significant income by giving up other offers of employment.

105. In justifiable reliance on Defendants' false promises, Plaintiffs further expended significant personal savings and took on significant personal debt in order to meet living expenses during the pre-acquisition process, paying for frequent travel back and forth to New York, mostly at their own expense (including hotel costs), and in relocating their family to New York—including a 21-year-old daughter with disabilities.  Among other things, this entailed travel and moving expenses and purchasing a truck and trailer.[3]

---

[3] Plaintiffs, like many circus employees, commonly reside in a trailer home on a lot designated for circus employees when the circus is not performing and on-site when the circus is performing.  In fact, most Big Apple Circus performers and employees resided in trailer homes at Damrosch Park, Lincoln Center during the circus' annual run in that location each year.

106.   The Solheims further expended their own personal funds for BigTop business, including purchasing multiple web domain names and a phone system.  While they were ultimately repaid for these costs, they did not receive their reimbursement until some six months after expending the money.

107.   The Solheims further expended their own personal funds for travel costs and registration costs in attending circus industry trade shows on behalf of BigTop, only a portion of which was ever reimbursed.

108.   The Solheims further expended their own personal funds to cover the travel and hotel expenses for a Ring Master candidate to whom Kahanovitz had promised to cover said costs, none of which was reimbursed.

109.   Because Mr. Solheim was a partner in the venture with an ownership stake and because he and Ms. Solheim were both anticipating a long and fruitful future with BigTop, the Solheims did not ask to be reimbursed for all of these personal expenses.  The Solheims recognized that personally absorbing some of these costs went along with Mr. Solheim being a member/partner.

110.   As members/partners in BigTop, Mr. Solheim, Defendants Kahanovitz, Perlman, Price, Salzman and Compass owed one another a fiduciary duty.  Accordingly, Mr. Solheim was further justified in relying on Defendants' promises.

*The Package*

111.   During March of 2017, BigTop offered Mr. Solheim and Ms. Solheim a package in writing that included a specified base salary, various guaranteed bonuses, and a specified equity stake in BigTop.

112.   After some negotiation, in mid-March of 2017 Mr. Solheim was given the title of Chief Operating Officer, with an annual base salary with various additional guaranteed bonuses.

113.   Mr. Solheim's additional bonuses included a non-discretionary budget bonus (for meeting BigTop's initial budget, as created by Mr. Solheim); a guaranteed non-discretionary Lincoln Center Bonus to be paid on opening night of the circus at the Lincoln Center location; and an additional non-discretionary "Super Bonus" for profits exceeding budget.

114.   Ms. Solheim was to have an executive role (she was eventually given the title Vice President of Administration) and she was given an annual base salary with additional bonuses that included a non-discretionary budget bonus and a guaranteed non-discretionary Lincoln Center bonus.

115.   Both Mr. Solheim and Ms. Solheim were each also given an equity ownership stake in BigTop along with a promise to discuss an increase after their first year of employment.

116.   As noted above, consistent with Defendants' prior unequivocal promises and in accord with Mr. Solheim's understanding that he was a member/partner in BigTop, through its press releases after finalizing the acquisition of the circus, BigTop repeatedly represented to the industry press, to the business press and to the world at large that Mr. Solheim was one of its three members/partners and represented Mr. Solheim as a member/partner in its submission to the Big Apple Circus Board and to the Bankruptcy Court when seeking approval of the acquisition.

117.   Mr. Solheim was also given control of BigTop operating bank accounts and credit cards.

118.   BigTop also represented Mr. Solheim as a partner in communications with third parties and continued to hold out Mr. Solheim as a BigTop member/partner throughout his tenure with the circus.

119.   Indeed, just days before unceremoniously and abruptly terminating Mr. Solheim's employment, BigTop sent him to Washington D.C. to represent BigTop at the Smithsonian's FolkLife Festival. Ms. Solheim joined Mr. Solheim in Washington with the knowledge and approval of Defendants for the purpose of observing and assisting with a Circus of the Senses performance.[4]

120.   In accord with Defendants' repeated promises that Mr. Solheim would be in charge and would run the circus, BigTop did not hire a Chief Executive Officer in March when Mr. Solheim was given the title of Chief Operating Officer. Nor did Defendants inform Mr. Solheim of any plans to hire a Chief Executive Officer or anyone else to whom Mr. Solheim might be expected to report.

*Defendants Renege*

121.   While Mr. Solheim began working as BigTop's COO, Defendant Salzman was tasked with managing certain aspects of starting up the company, including managing insurance issues (which are complicated in the circus industry), establishing a payroll system and other Human Resource tasks, onboarding employees and managing certain legal issues (*e.g.*, certain contracts, compliance issues and other regulatory matters).

122.   It soon became evident that Defendant Salzman was not handling his assignments effectively. There were delays, for example, in financing, in acquiring proper insurance, in setting up required workers' compensation and disability insurance payments and in setting up payroll.

---

[4] Circus of the Senses performances are sensory friendly performances created by the founders of the Big Apple Circus primarily for visually and/or hearing-impaired audiences.

123. More specifically, against the Solheim's advice, Defendant Salzman initially refused to use a professional employer organization service to manage some of its human resources issues. He also declined to use Mr. Solheim's recommended circus industry insurer, obtaining insurance through a more costly and less experienced provider. He further declined to hire Mr. Solheim's recommended attorneys, instead using others with less experience in the industry. He further declined the Solheim's advice on other matters and delayed in setting up bank accounts and credit cards for BigTop.

124. Defendant Kahanovitz also insisted on approving Mr. Solheim's hiring decisions and personally interviewing each candidate, causing delays in getting critical personnel on board.

125. Further, Defendant Kahanovitz cut Mr. Solheim out from important meetings with Defendant Perlman.

126. All of these problems caused delay and interfered with the Solheim's ability to timely accomplish BigTop's goals and meet targets with respect to getting the circus up and running.

127. In mid-April of 2017, despite Defendants repeated promises to Mr. Solheim that he would run the circus, Defendant Perlman voiced concerns relating to tensions between Mr. Solheim and Kahanovitz and informed Mr. Solheim that he and Ms. Solheim would now be reporting directly to him (Perlman) and that he would be the "acting CEO" and that Kahanovitz would now have the (non-operational) role of Chairman of BigTop.

128. At the same time, BigTop had also engaged Guillaume DuFresnoy (the Big Apple Circus' former Artistic Director) as a consultant on an independent-contractor basis. Defendants Perlman and Kahanovitz also told Mr. Solheim that he would be reporting to Mr.

DuFresnoy. The partners assured Mr. Solheim that he still held the role of COO and that these measures were temporary.

129. Mr. Solheim expressed concern to Kahanovitz that BigTop seemed to be trying to get rid of him and Ms. Solheim. Kahanovitz insisted this was not true and that the new reporting arrangement was temporary and would last only until the opening at Lincoln Center.

130. BigTop also subsequently engaged Michael Couper as a consultant, ostensibly to assist with the Defendant Salzman's workload and other issues involved in starting up the new venture, including implementing the budget plan, managing employee onboarding, managing insurance and legal issues. The Solheims were advised that Couper was engaged on a temporary basis to help manage these start-up issues. Couper told Mr. Solheim he was brought on to assist Mr. Solheim.

131. Couper nevertheless soon advised Ms. Solheim that she would report directly to him and that she should no longer communicate with or copy Defendant Perlman or his assistant on email correspondence. Increasingly, as was the case with Defendant Kahanovitz, Couper was curtailing direct communications between the Solheims and Defendant Perlman.

132. After the Solheims spent countless hours educating Couper with respect to issues unique to the circus industry and specific to the Big Apple Circus, on or about June 15, 2017, BigTop announced that Couper would be its Chief Executive Officer.

133. Despite Defendants repeated promises to Mr. Solheim that he would run the circus, Mr. Solheim was ordered to report to Couper.

134. As confusing and disjointed as BigTop's actions were through this early period of the circus' operations, one aspect is clear: In spite of their repeated promises to the contrary, Defendants did not allow Mr. Solheim to manage and run the circus.

135. Given the very short time frame that passed between the time BigTop commenced operations and the time Defendant Perlman declared himself BigTop's "acting CEO" and subsequently enlisted outside parties who were not BigTop members/partners, ultimately hiring and elevating Couper to be CEO, it is also clear that Defendants never intended that Mr. Solheim would run the circus.

136. Couper quickly jettisoned Mr. Solheim's advice and began running the circus in a manner contrary to Mr. Solheim's plans.

137. For example, Couper opted to treat certain inside sales staff as exempt employees—against Mr. Solheim's advice—thereby unnecessarily exposing BigTop to legal liability under federal and state labor laws; Couper altered the well-designed budget created by Mr. Solheim beyond recognition;[5] Couper ignored critical funding requirements and failed to secure necessary financing; along with Defendant Kahanovitz, Couper also precluded the Solheims from hiring certain key employees necessary to accomplish BigTop's goals, some of whom Kahanovitz and Couper misled and strung along even after they decided to hire others—without consulting Mr. Solheim or Ms. Solheim.

138. As CEO, Defendant Couper was in charge of financing. But he failed to acquire sufficient financing and, after he failed to do so, he even asked Ms. Solheim to secure a one million dollar line of credit.

139. Couper further assigned Mr. Solheim to work on projects that wasted his valuable time, while also dumping projects on Ms. Solheim that Couper, as CEO, failed to complete.

---

[5] In addition to Couper putting BigTop at risk based on his irresponsible budgeting, Mr. Solheim had a significant bonus tied to meeting *his* budget. For all intents and purposes, Couper's actions made it impossible for Mr. Solheim to earn that bonus.

140.   Along with Kahanovitz, Couper also interfered with the Solheims' communications with the Compass Partners and both he and Kahanovitz directed certain staff members and vendors to cut the Solheims out of discussions that they should have been a part of in their high-level roles.

141.   Defendant Kahanovitz also negotiated with and hired inexperienced employees in certain critical roles without Mr. Solheim's knowledge.

142.   In communications with Defendant Perlman and other Compass Defendants, Couper grossly misrepresented to Defendants Mr. Solheim's and Ms. Solheim's draft payroll budget, erroneously advising Perlman that the budget was well above Mr. Solheim's initial budget figures without explaining that it was a first draft of projected payroll expenses at Lincoln Center with expected downward revisions to come.

143.   Further, Couper inaccurately reported labor costs for the BigTop touring group by extrapolating temporary employees over a full year of employment and calculating his extrapolation at higher rates of pay and benefits required only in New York City—figures the draft budget more accurately represented.

144.   Couper's management style also included harassing and bullying conduct to the extent that certain vendors and BigTop's landlord advised that Couper made for a creepy and discomfiting presence.

145.   For example, in or about June of 2017, at a weekly staff meeting to discuss operations, Couper and the staff discussed the wrapping of trucks with Big Apple Circus advertisements.

146. During the meeting and in front of the entire staff, in response to a comment by Ms. Solheim concerning wrapping up the trucks, Couper said to Ms. Solheim, "I'd like to wrap you up."

147. Ms. Solheim was shocked and upset by this absurd and offensive comment—as were others attending the meeting—particularly since it was made in front of the entire operations staff.

148. Couper was also verbally abusive to the Solheims on other occasions and to other employees as well.

149. Defendants Couper and Kahanovitz also managed to further alienate much of the staff with their generally brusque and unfriendly manner, including dressing down employees in front of their coworkers, vendors and potential business associates.

*Termination of Plaintiffs' Employment*

150. Despite their fiduciary relationship with Mr. Solheim as members/partners of BigTop, on July 6, 2017, Defendants terminated Plaintiffs' employment without warning or notice or discussion of any performance problems.

151. Defendant Couper went into Mr. Solheim's office and advised him that his employment was terminated effective immediately and that he must clear out all of his personal belongings—which included moving out of his residence—by 5:00 p.m. the following day.

152. Immediately thereafter, Couper went into Ms. Solheim's office and advised her that her employment was terminated effective immediately and that she must clear out all of her personal belongings—which included moving out of her residence—by 5:00 p.m. the following day.

153. Mr. Solheim did not even have a chance to tell Ms. Solheim he'd been summarily fired before she was summarily fired herself.

154. Immediately after firing the Solheims, Couper went to the Solheims' fellow managers and staff, advised them that he had just fired the Solheims and demanded their loyalty to BigTop.

155. Defendant Kahanovitz similarly immediately informed BigTop employees in Washington D.C. attending the Smithsonian's FolkLife Festival, as well as others in the industry attending the festival, that the Solheims' employment had been terminated.

156. Neither Mr. Solheim nor Ms. Solheim had any opportunity to advise their coworkers or staff of the news of their respective terminations before Couper had reported it to them himself and demanded their loyalty.

157. Plaintiffs were blind-sided by their respective terminations and humiliated by the abrupt and brusque manner that Couper employed in implementing those terminations and by the way he broke the news to the Solheims' coworkers and staff.

158. Defendant Couper gave the Solheims no reason for the decision to terminate their employment, had no discussion with either of them concerning their termination or any transition process.

159. To the extent Defendants' conduct was driven by concerns that the Solheims would disparage Defendants to their staff, those concerns were unfounded. The Solheims actually encouraged fellow employees and vendors to continue their respective relationships with BigTop.

160. The Solheims soon returned to their home in Missouri, where they currently reside.

161.   In discussions following the termination of the Solheims' employment, Defendants have asserted that Mr. Solheim was never a member/partner in BigTop and have denied that Mr. or Ms. Solheim were ever given an ownership stake in the venture.

*Post-Termination Conduct*

162.   After BigTop terminated the Solheims' employment, it took further actions to harm them.

163.   Upon terminating the Solheim's employment, it offered them each a separation package. The package included continuing salary payments for a fixed amount of time. It also required the Solheims to waive all rights to their equity stake in BigTop.

164.   However, prior to the Solheim's deadline to accept (or reject) the terms of the separation package, BigTop rescinded its offer to both Mr. Solheim and Ms. Solheim and simultaneously threatened Ms. Solheim with legal action concerning a social media posting that BigTop deemed disparaging and defamatory toward BigTop, further accusing both Mr. and Ms. Solheim of malfeasance, among other things.

165.   Ms. Solheim's posting was in response to an article from Forbes.com. Ms. Solheim's posting addressed the Forbes article only in general terms. It did not mention BigTop or the Big Apple Circus or otherwise identify what entity or entities she may have been referring to. Indeed, Ms. Solheim's comments were of such a general nature it is unclear whether she intended to refer to any entity at all. The original posting to which she was responding was not from a BigTop employee or even anyone in the circus industry.

166.   Neither Ms. Solheim nor Mr. Solheim made any social media postings concerning BigTop since BigTop terminated their employment.

167.   Although upon termination they were told to vacate BigTop's property in Rock Tavern by the next day (which they did), Couper advised the Solheims that BigTop would purchase

the trailer home that the Solheims had purchased when they moved to New York. BigTop
needed to provide a trailer for some of its management employees and the Solheims no
longer had a need for their trailer.

168.   Although the trailer was in excellent condition, Ms. Solheim offered to sell it to BigTop
for $25,000—less than the amount they had paid for it when they purchased it just a few
weeks earlier and considerably less than its bluebook value.

169.   On July 14, 2017, Couper advised that BigTop was no longer interested in buying the trailer
and demanded that the Solheims remove it from the Rock Tavern site by July 28th.

170.   On July 22nd, after the Solheims arranged for movers to move their trailer and made a
significant non-refundable deposit toward the cost of the move, Couper offered to purchase
the trailer for $20,000 to be paid over five monthly installments. The Solheims declined
Couper's offer. Couper renewed his demand that the trailer be removed by July 28th.

171.   Couper never increased BigTop's offer for the trailer, though he did offer to pay $20,000
in a single payment the night before the trailer was to be removed—an offer the Solheims
could not accept.

172.   Accordingly, the Solheims were forced to move the trailer, at considerable expense, by
Couper's arbitrary deadline. They moved their trailer back to their home in Missouri.

173.   In their new-found and unexpected state of unemployment, the Solheims applied for
unemployment insurance benefits through the New York State Department of Labor
("DOL").

174.   BigTop challenged the Solheim's application, stating that the Solheims were terminated
for misconduct and accusing them of having ordered a BigTop employee to care for their

dog during work time for the few days that they were in Washington D.C. representing BigTop at the aforementioned Smithsonian FolkLife Festival.

175.    Neither Mr. Solheim nor Ms. Solheim ever ordered any BigTop employee to care for their dog. A fellow employee and long-term friend volunteered to do so as he lived in a trailer next door to them at BigTop's new base location in Rock Tavern, New York. The employee in question was also a salaried management employee and the date in question was a paid holiday specifically authorized by Defendants.

176.    When the DOL rejected BigTop's stated justification for withholding unemployment insurance benefits from the Solheims, BigTop created another reason to deny the Solheims their benefits.

177.    BigTop advised the DOL that the Solheims were independent contractors prior to April of 2017. As they had not been employees during the first quarter according to Defendants, they had not worked long enough as employees to receive unemployment insurance benefits.[6]

178.    Responsibility for initiating BigTop's payroll system fell to Defendant Salzman. The system was not affected in time for the first employees to be on payroll on March 1, 2017. BigTop arranged to pay the first employees, including the Solheims, in early April, retroactively with a check that was not run through the new payroll system, but with payroll deductions taken out of the check and ostensibly submitted to the proper governmental authorities as required by law.

---

[6]  This change affected only Ms. Solheim. Mr. Solheim was entitled to his Unemployment Insurance benefits regardless based on prior employment he had had in New York.

179.   To that end, Defendant Salzman communicated directly with BigTop's new payroll service provider (ADP) and asked them to properly calculate the correct payroll deductions for the retroactive pay.

180.   Moreover, BigTop also affirmed to the DOL that it began operations with six employees and that there were no persons who worked for BigTop who were not considered employees.

181.   On or about April 7, 2017, Defendant Salzman affirmed that upcoming paychecks were intended to cover payroll for the Solheims from March 1 through April 2, 2017.

182.   On or about April 10, 2017, BigTop then issued paychecks to pay the Solheims (and the other employees) their salary going back to March 1, 2017, with all legally required payroll taxes withheld.

183.   When the Solheims (through counsel) presented BigTop's counsel with documentary evidence showing that they were treated as and paid as employees beginning on March 1, 2017—not as independent contractors—BigTop changed its position and agreed that the Solheims had been employees as of March 1, 2017.

184.   Nevertheless, the Solheims received IRS Forms 1099 reflecting the payments for March of 2017 and part of July of 2017 (their last paycheck) rather than Forms W-2. Although Communications reflected that payroll taxes were withheld from these checks, upon information and belief, those taxes were never submitted to the proper tax authorities.[7]

---

[7] During the dispute over whether the Solheims were employees or independent contractors when they began their official employment with BigTop, Plaintiffs' counsel requested proof that the payroll taxes were properly submitted. Defendant never provided such proof. The Solheims were further blocked from access to BigTop's online employee portal so they could not confirm own whether these payments had been submitted.

185.    Immediately after the partners had won the bid to acquire the assets of the Big Apple Circus, Mr. Solheim began preparations for all aspects of managing the circus and with ramping up operations, including some public relations and marketing work.

186.    As part of those efforts, Mr. Solheim signed an agreement with a vendor known as Critical Mention, which provided information concerning the effectiveness of the circus' marketing efforts by independently monitoring the internet "hits" the circus would get and analyzing which terms would be most effective in triggering such "hits." Mr. Solheim discussed the service with Defendant Kahanovitz and entered into the agreement with Kahanovitz' knowledge and approval.

187.    In due course, the circus chose not to use Critical Mention's service.

188.    When Critical Mention came to BigTop demanding payment of a contractually required amount pursuant to the agreement, BigTop refused to pay.

189.    Instead, on or about October 16, 2017, BigTop advised the company that the agreement was signed by Mr. Solheim, who was "not an authorized representative" of BigTop and that Mr. Solheim was therefore personally responsible for the payment.

## COUNT I

### BREACH OF CONTRACT
### (Against All Defendants Except Defendant Couper)

190.    Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

191.    In consideration for his involvement and efforts in preparing the proposal to acquire the Big Apple Circus and his preparations and efforts to get the circus up and running, as part of a negotiated, written agreement Defendants awarded Plaintiff Larry Solheim a specified equity ownership stake in BigTop.

192.    In consideration for her involvement and efforts along the same lines, as part of a

negotiated, written agreement Defendants also awarded Plaintiff Rita Solheim a specified

equity ownership stake in BigTop.

193.    The Solheims fulfilled their obligations with respect to preparations and efforts to acquire

the circus and to get the circus up and running.

194.    After unceremoniously and abruptly firing Plaintiffs without cause, Defendants have

denied Plaintiffs' rights to their equity ownership stake in BigTop.

195.    As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of

damages in an amount equal to the value of their equity ownership stake in BigTop.

## COUNT II

### BREACH OF FIDUCIARY DUTY
### (Against All Defendants Except Defendant Couper)

196.    Plaintiffs hereby reallege and incorporate by reference each and every allegation

contained in the previous paragraphs of this Complaint as though fully set forth herein.

197.    As Mr. Solheim was a member/partner in BigTop, Defendants had a fiduciary duty to Mr.

Solheim.

198.    Defendants breached their fiduciary duty to Mr. Solheim by ignoring his advice and

expertise in the circus industry and refusing to work within the parameters of the budget

he created—a budget that Defendants had thoroughly vetted and agreed to.

199.    Defendants failure to adhere to the budgetary restrictions proposed by Mr. Solheim led to

financial damage to BigTop.

200.    As a member/partner and equity-stakeholder in BigTop, Defendants conduct harmed Mr.

Solheim's interest in the venture.

201. Defendants further breached their fiduciary duty to Mr. Solheim by abruptly terminating his employment without notice.

202. Defendants abrupt and callous termination of Mr. Solheim's employment proximately caused harm to Mr. Solheim.

203. As a result of the wrongful conduct alleged herein, Plaintiff Mr. Solheim is entitled to an award of damages in an amount to be determined at trial that includes loss of income and the lost value of his equity stake in BigTop.

## COUNT III

### PROMISSORY ESTOPPEL
### (Against All Defendants Except Defendant Couper)

204. Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

205. Defendants made unequivocal and unambiguous promises to Plaintiffs.

206. Plaintiffs reasonably and foreseeably relied on Defendants' promises.

207. Defendants reneged on their promises to Plaintiffs' great detriment and injury.

208. As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of damages in an amount to be determined at trial that includes, but is not limited to, payment for damage to their reputation in the industry, loss of income, and costs incurred in connection with their reliance on Defendants' promises.

## COUNT IV

### FRAUD IN THE INDUCEMENT
### (Against All Defendants Except Defendant Couper)

209. Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

210.   Defendants promised Mr. Solheim that he would be a member/partner in the venture, that he would be given an ownership stake in BigTop, that he would be in charge of the circus, that he should plan on a long and fruitful relationship with BigTop and that he would be "well taken care of" financially.

211.   Defendants made these promises fraudulently as they never intended that Mr. Solheim would be in charge and run the circus, that he would be a member/partner and given and ownership stake or that he would have a long and fruitful relationship with BigTop.

212.   Defendants made these fraudulent promises with the intent to deceive Mr. Solheim and Ms. Solheim into joining their efforts so that they could leverage Mr. Solheim's reputation within the industry to their advantage and gain the necessary approvals from the Bankruptcy Court and the Circus' Board to acquire the Big Apple Circus' assets.

213.   As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of damages in an amount to be determined at trial that includes, but is not limited to, payment for damage to their reputation in the industry, loss of income, and costs incurred in connection with their reliance on Defendants' fraudulent representations.

## COUNT V

### INTENTIONAL / NEGLIGENT MISREPRESENTATION
### (Against All Defendants Except Defendant Couper)

214.   Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

215.   As members/partners in BigTop, Defendants owed a fiduciary duty to Mr. Solheim; they were in a special privity-like relationship with him.

216.   In order to induce the Solheims to include them in their venture, Defendants promised Mr. Solheim that he would be a member/partner in the venture, that he would be given an

36

ownership stake in BigTop, that he would be in charge of the circus, that he should plan on a long and fruitful relationship with BigTop and that he would be "well taken care of" financially.

217. Defendants had no intention of keeping these promises when they were made.

218. Defendants knew or should have known that these promises were important to Mr. Solheim and that he intended to rely on them in determining whether or not to include Defendants in the business venture.

219. The Solheims reasonably relied on Defendants' misrepresentations to their detriment.

220. As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of damages in an amount to be determined at trial that includes, but is not limited to, payment for damage to their reputation in the industry, loss of income, and costs incurred in connection with their reliance on Defendants' misrepresentations.

## COUNT VI

### UNJUST ENRICHMENT
### (Against All Defendants Except Defendant Couper)

221. Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

222. Defendants were unjustly enriched at Plaintiffs' expense by accepting Plaintiffs' extensive sacrifices and work without pay during the pre-acquisition period, only to summarily terminate their employment shortly after they began paying Plaintiffs.

223. Defendants never fully paid Plaintiffs for their work during the pre-acquisition period.

224. Principles of equity and good conscience require that Plaintiffs recover payment for Defendants' unjust enrichment.

225.   As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of damages in an amount to be determined at trial that includes, but is not limited to, the value of the enrichment Defendants received as a result of Plaintiffs' efforts along with payment for all unpaid services provided.

## COUNT VII

### QUANTUM MERUIT
### (Against All Defendants Except Defendant Couper)

226.   Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

227.   Plaintiffs performed extensive services for Defendants in good faith and without payment therefor.

228.   Defendants requested and accepted Plaintiffs' services.

229.   Premised upon the promises of Defendants, Plaintiffs ultimately expected recompense for their work.

230.   The value of Plaintiffs' work is, in part, measurable based on the pay rate Plaintiffs did receive once they became paid employees. The value of Plaintiffs' work in terms of the benefit to Defendants is immeasurable.

231.   As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of damages in an amount to be determined at trial that includes, but is not limited to, payment for all unpaid services provided.

## COUNT VIII

### DEFAMATION/DEFAMATION *PER SE*
### (Against All Defendants, Including Defendant Couper)

232. Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

233. Defendants made a false statement about Mr. Solheim to a third party in advising Critical Mention that Mr. Solheim signed its agreement ostensibly on behalf of the circus while he had no authority to do so and that Mr. Solheim was therefore personally liable for the payment due.

234. Such false statement imputed to Mr. Solheim fraud, dishonesty and/or misconduct in his profession or trade.

235. Defendants further made a false statement to the New York Department of Labor about alleged misconduct by the Solheims in connection with their claim for unemployment insurance benefits. Such false statements imputed misconduct to the Solheims.

236. Defendants' conduct constitutes defamation *per se* against the Solheims.

237. As a result of the wrongful conduct alleged herein, Plaintiffs are entitled to an award of damages that includes, but is not limited to, payment for damage to their reputation in the industry, in an amount to be determined at trial.

## COUNT IX

### DISCRIMINATION PURSUANT TO THE
### NEW YORK CITY HUMAN RIGHTS LAW ("NYCHRL")
### SEXUAL HARASSMENT/HOSTILE ENVIRONMENT
### (§ 8-107[1]—Against Defendants BigTop and Couper)

238. Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

239. Defendant Couper made offensive and sexist comments to and about Ms. Solheim in front of her co-workers and staff based on her gender.

240. The offensive and sexist comments constituted sexual harassment and created a hostile work environment for Ms. Solheim.

241. Defendant BigTop and Defendant Couper were both Ms. Solheim's employer pursuant to the New York City Human Rights Law ("NYCHRL") during the relevant time.

242. As Ms. Solheim's employer, both BigTop and Couper are liable for Couper's offensive and sexist comments.

243. Upon information and belief, Defendant Couper made no such offensive and sexist comment(s) to and about male employees.

244. Ms. Solheim was treated less favorably than male employees because she is female.

245. As a result of the wrongful conduct alleged herein, Plaintiff Ms. Solheim is entitled to an award of damages in an amount to be determined at trial.

## COUNT X

### AIDING AND ABETTING PURSUANT TO THE
### NEW YORK CITY HUMAN RIGHTS LAW ("NYCHRL")
### SEXUAL HARASSMENT/HOSTILE ENVIRONMENT
### (§ 8-107[6]—Against Defendant Couper)

246. Plaintiffs hereby reallege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

247. To the extent Defendant Couper is not directly liable for discrimination against Ms. Solheim under the NYCHRL, Defendant Couper aided and abetted BigTop's sex discrimination, sexual harassment and hostile environment against Ms. Solheim.

248.    As a result of the wrongful conduct alleged herein, Plaintiff Ms. Solheim is entitled to an

award of damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.      An award of compensatory damages in favor of Plaintiffs.

F.      An award of additional damages in favor of Plaintiffs, including liquidated and/or

punitive damages.

G.      All penalties available under applicable laws.

H.      An award of litigation costs and expenses, including, but not limited to,

reasonable attorneys' fees and costs pursuant to applicable statutes or rules.

I.      Pre-judgment and post-judgment interest as provided by law.

J.      An award of any additional and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable of right by jury.

Dated: New York, New York
     October 14, 2018         THE KAPLAN LAW OFFICE

                             Susan Kaplan, Esq. (SK 1735)
                             Charles Caranicas, Esq. (CC 9244)
                             30 Wall Street, 8th Floor
                             New York, New York 10005
                             Tel: 347.683.2505 / 347.432.1463
                             *Attorneys for Plaintiffs*